JAMIESON ASSOCIATES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ESTATE OF MARGARET WAINWRIGHT, JOHN W. WAINWRIGHT, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SEASIDE IMPROVEMENT COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JOHN W. WAINWRIGHT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WAINWRIGHT AND SMITH COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WAINWRIGHT, REMSEN AND TATOR CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 75717, 76899, 77018, 77019, 77212, 77213.

Promulgated January 20, 1938.

*Benjamin Mahler, Esq.*, for the petitioners.
*J. R. Johnston, Esq.*, for the respondent.

98

OPINION.

· DISNEY: There are numerous issues involved in these proceedings, some of them being common to all the cases and others having application only to some of the cases.

In considering and discussing the issues, if the same are only applicable to one or more but not all of the cases, we shall so indicate; otherwise, it will be understood that the issues discussed are applicable to all of the proceedings and petitioners.

It is first necessary to consider as a preliminary proposition the contention of the respondent that the petitioners, the estate of Margaret Wainwright, Jamieson Associates, Inc., and Seaside Improve-

ment Co., had no title to the part of their lands constituting the fore-shore condemned and taken in 1925, and therefore have no basis for a value as of March 1, 1913, or date of acquisition, for purposes of computing profit or loss.

The deficiency was originally computed by the Commissioner upon the assumption that the petitioners were the owners of the property condemned, and the question as to title arises because of increased deficiency asked by amended pleadings filed at the time of the hearing. The respondent adduced evidence to show such lack of title, and said petitioners contended that the question is not open here, for the reason that the judgment in the condemnation proceeding was conclusive in that respect.

Ordinarily and primarily, title is not the question in condemnation proceedings, but it is equally true that a condemner can not deny the title of the condemnee whose lands he condemns. In *Village of Olean* v. *Steyner*, 135 N. Y. 341, 343; 32 N. E. 9, the Court of Appeals of New York had before it a case wherein the village sought to condemn certain property of the defendants. It also sought to raise the question that the property had been dedicated to the public use. The court said:

* * * But the municipality waived any such claim, if it existed, by proceeding under the charter to condemn the landowner's right, and to assess his damages for what was proposed to be taken from him. Manifestly, the village conceded his right when it instituted a proceeding to take it away, and under a provision of the charter having no application except where there is an owner other than the village and whose title is to be divested. To say that there is not such owner, and that the easement sought to be condemned belongs to the municipal corporation by the act of the owner, is to deprive the proceeding of all foundation and invite its dismissal for that reason. * * *

To the same effect are *Westchester County* v. *Wakefield Park Realty Co.*, 129 N. Y. S. 156; *Matter of Bronx Parkway Commission*, 164 N. Y. S. 9; affd., 181 N. Y. S. 928; and *Matter of Smith*, 278 N. Y. S. 467.

In *City of Geneva* v. *Henson*, 195 N. Y. 447; 88 N. E. 1104, the issue of the ownership of the fee was raised in a condemnation proceeding not unlike the proceeding involved herein in that the land was situated on the west shore of Seneca Lake, a navigable water, and the question of the ownership in riparian lands as between the state and the claimant thereof was involved. The city in its petition alleged its ownership, which was denied by the defendants and the question was referred by consent to a referee. It was held that the municipality could not contest the defendant's ownership, the existence of which it assumed as the basis of its proceeding, and the parties having tried out the question of title, the decision was binding on them.

In *In re City of Buffalo*, 132 N. Y. S. 926, the situation was similar to that herein. The city of Buffalo condemned land for park purposes. It developed that determination of title as affected by erosion or constant recession of the shore line of a lake was necessary, and it was assumed by all parties that the determination of such claims was essential in order to fix compensation to be awarded to the owner. It was held that the defendants, having joined in consenting to the determination of such question, could not thereafter object to such decision. See also *Village of Medina* v. *Graves*, 113 N. Y. S. 52.

The judgment in the condemnation proceeding involved herein shows on its face that the question of title was considered. The final judgment was entered pursuant to agreement in that the awards were paid only to those who filed stipulation accepting the amount of the respective awards in full settlement of their respective claims and permitting reservations for assessments. It is apparent, therefore, that in its final consummation the condemnation award involved herein was essentially based upon agreement involving a determination of title in much the same manner as in the cases just above cited. We consider, therefore, that the parties to the condemnation proceedings are in the same position as if the question of title had been in every respect a proper one before the court. From this it follows that we will and do consider and hold that the Board is bound by an adjudication as to title, under the principles laid down in *Freuler* v. *Helvering*, 291 U. S. 35, and *Blair* v. *Commissioner*, 300 U. S. 5, a state court having determined the question of title. Respondent contends, however, that an adjudication as to title in 1925, at time of condemnation is no adjudication as to March 1, 1913, or other date, for basic value. (This argument as to March 1, 1913, value, of course, is applicable only to the Seaside Improvement Co., since the date of acquisition of property as to Jamieson Associates, Inc., and the estate of Margaret Wainwright is 1923.) But we think the contention will not stand. The local court did consider not only title as of 1925, date of condemnation, but previous title as well, as is evidenced by the journal entry wherein it refers to "Claim of title by avulsion", and sustains "Claim of title upon the theory of avulsion." Had there been no contention between city and condemnees as to title, no occasion would have arisen for considering avulsion or erosion. The condemnation judgment is a finding, binding on us, that the foreshore, including land condemned and taken, had not been lost to the previous owners because the physical loss of land was by avulsion. The evidence is that the Seaside Improvement Co., and the predecessors in title of the Margaret Wainwright estate and Jamieson Associates, Inc., had, prior to such avulsion, owned this part of the seashore, which was

taken upon condemnation; therefore, after the avulsion, and at time of acquisition by the Margaret Wainwright estate and Jamieson Associates, Inc., title thereto passed to these two petitioners; and as to the Seaside Improvement Co., it remained owner. We conclude that the condemnation judgment was adjudication of title in petitioner, Seaside Improvement Co., on March 1, 1913, and in September and October 1923 as to the Margaret Wainwright estate and Jamieson Associates, Inc., respectively, and hold that the above-named petitioners held title to the foreshore on the respective dates for basic values. It therefore follows that the above-named petitioners are in a position to set up, as a basis against the condemnation money received, such values as we conclude are shown as of the respective basic dates. The other petitioners in these proceedings held grants from the State of New York and, as to them, there is no contention as to title to foreshore, and therefore no question as to right to deduct proper values at basic dates.

■ Having decided the preliminary question of title, the next question requiring our attention is as to consequential or severance damages which all petitioners seek to subtract from the condemnation moneys received. The condemning court, they say, did not specify as to whether such severance or consequential damages were allowed, but that they were required to be allowed, and therefore must be ascertained by evaluation of the properties taken and not taken. We agree that in general it was necessary for the condemning court to consider not only the value of the property taken, but the amount of severance or consequential damages, if any, to the remainder not taken; but we do not agree that because no consequential damages were awarded it therefore follows that the court did not consider such damages in this instance. A requirement that the court must consider the question of such damages is by no means the same as requirement that it award such damages—for the obvious reason that in the opinion of the court there may be no such damages to award. We think that this was the conclusion of the trial court in the matter here at hand and think, moreover, that the judgment of condemnation on its face so shows, for the judgment is not as silent on this question as petitioners urge. It does not simply award a lump sum, without more, in each case, but in two cases among the petitioners here involved, to wit, the Seaside Improvement Co. and Wainwright & Smith Co., a certain amount is awarded for land and a certain amount for improvements. The Wainwright & Smith Co. was awarded for land, $138,600, for improvements $25,000; while the Seaside Improvement Co. was awarded for certain lands $76,406, and for improvements $7,000. The judgment in condemnation involved not only the property in which these petitioners are interested herein, but a very large number of other tracts. The journal

entry of judgment is before us in full, and we find a great many other instances where, just as above stated, an amount is awarded for land with a separate amount for improvements. This indicates that "land" meant land actually taken, as distinguished from land with improvements upon it. "Land" in general means real estate, not damages to other land or property. This careful particularization of "land" precludes the idea that it is a general term including consequential damage for land not taken. Title to land and improvements taken passed to the municipality. It could not be said that the designation as to improvements indicated merely damage to them, and that they were retained by the owner; no more can it be said that "land" designates mere damage done. In one instance the judgment refers to an "award of $25,000 made for improvements." The court refers to "evidence as to values" and not to damages. The "final decree" prepared pursuant to the judgment, and giving more detail, likewise itemizes land and improvements and adds the amounts of interest computed in each case. Such itemization is inconsistent with tacit inclusion of consequential damages. We conclude that the condemning court considered that there was no consequential or severance damage, and if we were free to examine the correctness of its conclusion, as we are not, we having concluded that the opinion designates the elements of the award, we could not say, in the face of the form of the condemnation judgment, that the conclusion of the condemning court was incorrect, for the reason that the condemnation proceeding, as well as the statutes upon which it was based, preserved to the remaining property of condemnees the rights of "easements of light, air, and access over, along, and across" the boardwalk. The condemnees were left substantially, if not technically, in the position of riparian or littoral owners. The condemnation was for purposes of a public beach and title was taken for that limited purpose.

Littoral or riparian rights are real and valuable, and such rights were expressly reserved to the remaining lands by the condemnation. *In re City of New York*, 61 N. E. 158, defines a riparian owner's rights as "easement of passage and the transportation of merchandise, to and fro, between the navigable water and his land; to fish and draw nets; to land boats and to load and unload the same." In that case they were held to be violated by the erection of a street to which riparian owner had no access, a veritable "Chinese Wall." The case states that it is unnecessary to inquire as to the right to compensation if "a general street open to commercial traffic" had been opened in the tideway. *Ennis* v. *Grover*, 103 N. Y. S. 1088; affd., 85 N. E. 1110, holds that riparian rights are not destroyed by the existence of a public street between riparian lands and the water. To the same effect is *Nevins* v. *Friedauer*, 184 N. Y. S. 894, which also defines riparian rights, in-

cluding therein right of access, of accretion, right to reasonable use of the water for all legitimate purposes, and right to have the shores of the owner's land washed by the adjacent waters. *Oelsner* v. *Nassau Light & Power Co.*, 118 N. Y. S. 960, decides that a riparian owner is entitled

* * * only to a reasonable use of his easement, consistent with the state's right to make such use of the tide land under water as the public interest may require.

This is a fair statement of the general law on the subject. To the same effect is *Hedges* v. *West Shore R. Co.*, 150 N. Y. 150; 44 N. E. 691. Herein the petitioners, so far as the land not taken and paid for is concerned, were merely shut off from the beach to the extent only that the boardwalk interfered. Otherwise they retained their original right to access to the sea. Such interference, as above seen, not calling for compensation because not a compensable invasion of riparian or littoral rights as properly defined, and petitioners having had preserved to them rights of access, light, and air across the boardwalk, we conclude that the construction of the boardwalk can not be said to, and in the opinion of the court did not, cause consequential or severance damages. It is our opinion, upon the record herein, that the boardwalk did not decrease the value of the remaining land, and, considering the easements left to it over the land taken, we believe that the condemning court intended to award none. The land above Ocean Avenue, being separated by a street from the property facing upon the boardwalk, can not be regarded as affected in value by its erection.

We hold, therefore, that no consequential or severance damages were awarded by the condemning court and that there was no severance or consequential damage suffered by any of the petitioners herein. Petitioners, therefore, can not deduct any amounts as consequential or severance damages from the amounts awarded, and the bases herein involved are only as to the lands condemned and taken.

■ This brings us to consideration of the proper bases as to the various properties involved in these consolidated proceedings.

The petitioners, the estate of Margaret Wainwright and Jamieson Associates, Inc., argue that the value of the properties involved was the same at the date of condemnation and taking on July 15, 1925, as of the date of acquisition in September and October, respectively, 1923; while the other petitioners argue that the value on July 15, 1925, was less than the value on the basic date, March 1, 1913. Obviously, the fact of value on July 15, 1925, is not directly material, since we have merely the question of value upon basic dates as against the awards received in 1931, and gain or loss is to be computed accordingly. The value as of July 15, 1925, therefore, is to be regarded only upon the idea that the awards are to be presumed to be the same as the actual

value of the properties condemned and taken. We think, however, there is, under the circumstances herein involved, little strength in any presumption that the awards determine actual values as of July 15, 1925, for the record shows that the awards as a whole in the general condemnation proceedings were reviewed and cut down from approximately $12,000,000 to approximately $9,000,000, and that even at this figure acquiescence therein was recommended to the city of New York by its counsel in order to put an end to litigation and avoid expense of interest charges and because of financial distress.

Petitioners adduced much detailed evidence in an attempt to demonstrate that real estate values on March 1, 1913, were, because of an alleged monopoly, so to speak, upon the amusement business at Rockaway Beach, greater than values on July 15, 1925, and greater than the awards made. As above stated, it would be largely immaterial if such values were greater than those of July 15, 1925, the direct question being whether they were greater than the awards made. In spite of some evidence of rental values being higher in 1913, we are unable to believe that the values of these properties were not less on the basic dates involved than the amounts of the awards involved herein. Rentals did not, in our opinion, in these circumstances, determine fair market value of realty. They are a circumstance to consider, but not exclusively. The testimony as to rental values was to a considerable extent rendered by interested persons and is, we think, offset by that of less interested parties, and by expert testimony that values of property had increased on July 15, 1925. In particular, the evidence as to rental values in 1913 can not, in our opinion, prevail over that as to actual sales. The Seaside Improvement Co. in 1913 made various lot sales at prices which amount to one dollar per square foot, above Rockaway Boulevard, south of the Long Island Railway tracks, and the record convinces us that the values there were not far different from those nearer and upon the beach, because of the seasonal character of the beach business and the permanence of that transacted farther away from the beach. Yet, evidence offered by petitioners values the beach land condemned up to $5 per square foot, and land under water at 50 cents per square foot, being half the value of land near Rockaway Beach Boulevard at the same date. Such disparity is too great for our credulity. Moreover, the idea of monopoly of amusement business by the particular section where petitioners' properties lay is affected by evidence that in 1913 a boardwalk connecting with Ocean Avenue by an incline walk near Beach 100th Street extended eastward to Beach 92nd Street, or Holland Avenue, at which there was a railroad station. At the north end of Holland Avenue on Jamaica Bay, there was a landing called Holland's Landing and that avenue corresponded in the Holland section

with Seaside Avenue, or Beach 103d Street in the Seaside section. It was the main street in the Holland section. Obviously, such boardwalk connecting with Holland Avenue as well as Seaside section had a tendency to equalize the possibilities of advantage from bathing and beach amusements over the beach in front of it, and this is too much of a spread for acceptance of the idea of a monopoly along Beach 100th Street to Beach 104th Street, the location of those petitioners affected by March 1, 1913, values.

In addition, the idea of monopoly of amusement business in the Seaside section of Rockaway fails to be convincing when it is considered that at Arverne, from about Beach 56th Street to Beach 74th Street, there was on March 1, 1913, another boardwalk. Petitioners' contention that this boardwalk was very short and only privately used is not borne out by the evidence. This extensive boardwalk at Arverne, and the several stations on the railroad in close proximity to Seaside, such as the Rockaway Park station between Beach 115th and Beach 116th Street stations, together with the fact that most of the business came by boat, coming to several piers along Jamaica Bay (obviously including the landing at Holland Avenue), tend to negative, we think, petitioners' contention that the Seaside section was highly valuable in 1913 because of a monopoly on amusement business. Also, we are not impressed greatly with the contention that business had so deteriorated by 1925 as to make values far less than in 1913. It is true that there is evidence of effect of daylight saving, prohibition, and discontinuance of the Brooklyn Rapid Transit service from the Long Island Railroad tracks, but it is apparent from the evidence that any effect of this discontinuation was replaced by the augmented automobile traffic. The evidence is positive that the automobile did increase business for the business men, the amusement devices, and the concessions, and that the more that transient people came in the better business would be. Yet, these businesses are the distinctive feature of Seaside. A factor assisting these types of business could not fail to assist other businesses such as restaurants, etc.—which may indeed well be included in the term business men as used. Moreover, the evidence that most of the pleasure seekers came to Rockaway by boat, which continued to run up to 1934, tends to refute the idea of serious recession of business by 1925. There is no substantial contradiction in the record that more business, more people, came to the peninsula in 1925, and the only question is as to whether the diffusion of business to some extent over the whole beach was sufficient to cause decline in prices in the Seaside section by 1925. The evidence does not so demonstrate. There were in Rockaway in 1913 several railway stations, several piers, another long boardwalk, and at least some diffusion of business

at that time. We are not convinced that Seaside section did not receive, from the uncontroverted increased patronage of Rockaway Beach by 1925, ample business to cause values not to deteriorate. The less interested testimony is that business in the Seaside section was fair in 1925, was about the same as in 1914, was good until 1928 or 1929, had not dropped off by 1925, and changed markedly after the building of the boardwalk (which was finished in the autumn of 1928). We are unable, under all the evidence, to believe that realty values in 1913 were greater than in 1925, or greater than the awards made. The idea that the boardwalk diffused business is wholly immaterial here, since it was not begun until after date of vesting of title, July 15, 1925, and not completed until 1928. Its erection in no wise demonstrates diffusion of business in July 1925, or that at that time 1913 values had decreased. The tendency, as expressed by John W. Wainwright, one of the petitioners, was for beach front property to increase in value with increase in population and consequent increase in demand for bathing facilities. We conclude that petitioners' property that was condemned and taken was more valuable in 1925 than in 1913.

Considering now more particularly the properties here involved: The various properties differed greatly in value, as is indicated not only by the evidence, but by statements in briefs. The properties of the Wainwright & Smith Co., John W. Wainwright, and Wainwright, Remsen & Tator Corporation, however, adjacent to Beach 103rd Street and Beach 104th Street, the principal business section in Seaside, had not greatly different values. The front footage involved in the properties herein is not shown with exactness by the evidence, but upon briefs the petitioners and respondent adopt the same figures, and they are therefore adopted by us, in the absence of exact information. No distinction is made between footage on the ocean and on Ocean Avenue. Property north of Ocean Avenue was not affected by the condemnation.

It is impossible to reconcile the highly conflicting evidence offered by the contending parties as to values, the petitioners' witnesses valuing the property appraised generally speaking, as several times as valuable as respondent's witnesses concede, and two or three times the amount of the awards. Respondent's witnesses appraised according to footage upon the ocean or on Ocean Avenue, while those for petitioners placed value upon a square foot basis. Under all the circumstances and evidence shown in the proceedings, we do not believe that the values were as high as contended by petitioners' witnesses. Their estimates often vary so much as to be impossible of acceptance. Thus, one witness valued the Wainwright and Smith properties at more than twice as much as did another witness—a

difference of $310,800 on the same property; and a witness valued the John W. Wainwright property as worth $214,000 as against another's estimate of $119,978.50. Again, a witness set the value of the property of the Wainwright, Remsen & Tator Corporation at $363,400 as against $196,596 set by another—little more than half as much. These figures included all damages. We conclude that the basis of front footage upon the ocean is the usual, and sounder and more reliable method of appraising value. The value of land under water we find under the evidence to be $25 per linear front foot on the ocean. We can not believe under all the evidence, that it was worth half as much as land in the neighborhood between Rockaway Beach Boulevard and the Long Island Railway tracks—which is the effect of petitioners' figures compared with actual sales made in 1913.

After consideration of all of the evidence, we have arrived at the following conclusions: Considering the property southward from Ocean Avenue, and including all rights under the ocean, we find and hold that the property of John W. Wainwright, condemned and taken, Docket No. 77019, with a frontage of 120 feet upon the ocean, had on March 1, 1913, a fair market value of $275 per front foot, making a total of $33,000. This is shown by the fact that the whole property before the condemnation had a fair market value of $700 per front foot, and that the property left after condemnation had a fair market value of $425 per front foot. We find and hold that the property of the Wainwright & Smith Co., condemned and taken, Docket No. 77212, with a frontage of 264 feet upon the ocean, had a fair market value on March 1, 1913, of $275 per front foot, making a total of $72,600; this is borne out by the fact that the whole property had a fair market value as of March 1, 1913, of $775 per front foot, and that the land left after condemnation had a fair market value on March 1, 1913, of $500 per front foot. The property of the Wainwright, Remsen & Tator Corporation, condemned and taken, Docket No. 77213, with a frontage of 214 feet upon the ocean, had a fair market value on March 1, 1913, of $275 per front foot, making a total of $58,850; this is shown by the fact that the whole property had a fair market value of $725 per front foot, and that the property left after condemnation had on March 1, 1913, a fair market value of $450 per front foot.

As to the properties of the Seaside Improvement Co., Docket No. 77018; estate of Margaret Wainwright, Docket No. 76899; and Jamieson Associates, Inc., Docket No. 75717, we, having rejected respondent's contention as to lack of title, have likewise left for consideration only the proper bases. As to the Seaside Improvement Co., Docket No. 77018, we find that the March 1, 1913, value of the property

taken was less than that of the Wainwright & Smith Co., the nearest property herein involved to the west. The evidence is clear that Remsen Avenue, or Beach 103rd Street, was the main business artery in the Seaside section, and that values decreased eastward therefrom. We have found the condemned portion of the property of the Wainwright & Smith Co. to have had a value on March 1, 1913, of $275 per front foot. Evidence adduced by the petitioner ascribes to the front foot value on the Atlantic Ocean and Ocean Avenue of the beach land lost by (i. e., condemned and taken from) the Seaside Improvement Co. a value of 82.5 percent of that ascribed to the Wainwright & Smith Co. We accept and adopt this proportion, consistent with other evidence, and applying it to the value of $275 per front foot already found for the Wainwright & Smith Co. property, we find that the Seaside Improvement Co. property condemned and taken had a fair market value on March 1, 1913, of $226.87 per front foot for 250 front feet on the ocean, or a total of $56,717.50.

As to the estate of Margaret Wainwright, Docket No. 76899: The value of the properties involved herein (including the entire lots, and not merely the property condemned and taken) was on September 10, 1923, the date of acquisition by petitioner by death of the decedent, $79,500, according to the estate tax return filed by the executor, and introduced in evidence by petitioner. This value in the estate tax matter was agreed to by the Government. The presence of Negroes affected the value of this property. Petitioner contends that the basic value of the property condemned and taken was, on September 10, 1923, not less than the amount of the award, $133,268.40. Upon this basis the entire lots would at date of acquisition obviously be worth a far greater amount. Such a value is so much greater than the value solemnly represented in the estate tax return that we are unable, with evidence also before us that this property is worth less, in part because of encroachment of Negro population, than the other properties involved in these proceedings, to accept such high figures. The respondent in the deficiency notice determined a basic value on the property actually condemned and taken of $60,353.10. Being unable to accept the values offered by the petitioner for this property, and believing that the evidence fails to overcome the presumption of the correctness of the respondent's determination, which is borne out by and consistent with the valuations returned in the estate tax return, we sustain the respondent's determination in the deficiency notice of a fair market value of $60,353.10. The respondent, having adduced no testimony as to the value of this petitioner's property, can not be said to have abandoned the determination set in the deficiency notice.

As to the Jamieson Associates, Inc., Docket No. 75717: The board of directors of this company on October 5, 1923, passed a resolution expressing their opinion that all of the property then being acquired was of the fair market value of $95,000, and later issued stock of the company of the par value of $95,000 in payment therefor. This was all of the then stock of the company. The transferor was not in control of the corporation immediately after the transfer. In the absence of any evidence as to the fair market value of the corporation's entire capital stock which was exchanged for the property, the basis of the property is the fair market value of the property received in exchange. *John Glackner Realty Corporation*, 11 B. T. A. 151; *Gillette Rubber Co.*, 31 B. T. A. 483, 490; *Ida I. McKinney*, 32 B. T. A. 450, 456. Merely as par value of the stock issued, the figure $95,000 offers no criterion, but that amount as the fair market value of the properties then purchased provides a measure of value, which in turn represents the basis (cost) of the property. Said valuation was subject to and should have added to it $50,000, the amount of a mortgage subject to which the property was purchased, giving a total valuation of the then acquired properties of $145,000. Six tracts of land were acquired in the exchange for the $95,000 in capital stock, but only two of them are here involved, and the record shows that these two properties were entered upon the books of the corporation at time of acquisition at a total of $24,000. Moreover, these two tracts, and another valued at $21,000, were transferred in a single deed which bore revenue stamps of $45—indicating an actual value of $45,000 for the three tracts, or $24,000 for the two here involved. This value for the two tracts was reduced to a base of $21,798.81 because of awards received in connection with the particular properties. These figures were represented as basic value in petitioner's income tax return. We can not accept the value entailed in the evidence of the petitioner which is so wholly out of line with the valuation as set in the books of the corporation, with the records of the opinion of its board of directors at the date of interest here, with the value used for stamp tax purposes, and with the figures used by petitioner in its return. It was not until much later that petitioner contended for a higher figure. We conclude that the fair market value was as shown upon the corporate books, which amount represents cost; and that, the respondent having valued at the same figure the portion condemned, the presumption of correctness of respondent's determination has not been overcome by petitioner, and it should be, and is, approved. The cost to petitioner in October 1923 of the condemned portion of the petitioner's property is found to be $24,000, and the basis as of that date is found to be $21,796.81. Such basis, amounting to $120 per front foot on the ocean, is con-

sistent with that of the properties of other petitioners several blocks westward, the evidence being that values decreased with the distance eastward from Beach 103rd Street. The respondent offered no testimony on the value of this property, and is not in the position of abandoning his determination of deficiency.

■ The next issue is whether that part of the award which was withheld from each of the petitioners by the comptroller of the city of New York should be treated as income in 1931.

The facts have been fully set forth. Although the assessments were not made until 1934, we find no distinction in principle between the situation herein involved and that in *Carrano* v. *Commissioner*, 70 Fed. (2d) 319; *Wolf* v. *Commissioner*, 77 Fed. (2d) 455, and *Christian Ganahl Co.* v. *Commissioner*, 91 Fed. (2d) 343; certiorari denied, 302 U. S. 748, wherein assessment and award are, in effect, offset, and only the difference regarded as income. In *Central & Pacific Improvement Corporation* v. *Commissioner*, 92 Fed. (2d) 88, there was in part involved, as here, an assessment made in a year later than that of the award, yet the cases last above cited were followed, and the same conclusion reached. The assessments herein involved were provided for by the same law governing the condemnation and contemplated in the condemnation proceedings. We therefore conclude and hold that the amounts withheld from the awards herein for purposes of meeting assessments, so far as used for that purpose, did not constitute income to petitioners in the taxable year when withheld.

■ The fourth issue, which we will now consider, is involved in all six cases and is with respect to the proper treatment of the amounts designated as "interest" and allowed petitioners in 1931 as part of the compensation to which the petitioners were entitled on account of the condemnation and taking of their property as indicated in our findings of fact.

The petitioners contend that the amounts constitute a part of the awards proper, whereas the respondent insists that the amounts designated as "interest" and set out in items separate from the awards proper are really interest on the awards and are ordinary income, taxable as such, and not taxable merely as capital net gain. Numerous authorities are cited by counsel of the respective parties to sustain their contentions.

In the case of *Woodward-Brown Realty Co.* v. *City of New York*, 197 N. Y. S. 162 (203 App. Div. 625), the court, in part, said:

The theory of the law is that, where land is taken from a private owner by right of eminent domain for a public use, payment of the value thereof should be coincident with the taking, and if for any reason payment is postponed the

right to interest, from the date of the taking of the property until the date of payment, follows as a matter of strict constitutional right. *People ex rel, Central Trust Co.* * * *

A similar attitude is taken by the Federal courts, as is shown in *Phelps* v. *United States*, 274 U. S. 341, 344, wherein claim was made for just compensation for the value of the use of a wharf, on which petitioners had a lease and which was taken over for military purposes by the United States, the Supreme Court saying:

* * * Plaintiffs' property was taken before its value was ascertained or paid. Judgment in 1926 for the value of the use of the property in 1918 and 1919, without more, is not sufficient to constitute just compensation. * * * The Government's obligation is to put the owners in as good position pecuniarily as if the use of their property had not been taken. They are entitled to have the full equivalent of the value of such use at the time of the taking paid contemporaneously with the taking. As such payment has not been made, petitioner is entitled to the additional amount claimed. * * *

It is held, therefore, by both state and Federal courts that the party whose property is condemned and taken is entitled to and should receive full compensation therefor, paid contemporaneously with the taking.

In the instant proceedings the values found for the petitioners' properties as at July 15, 1925, when their properties were taken and title thereto passed to the city, are set out in the opinion of June 9, 1931, and these are the amounts which petitioners would have received if payment to them had been made contemporaneously with the taking or passing of title; but payment was not made them until after June 8, 1931.

Section 976 of the Greater New York City Charter provides that, where property is condemned by the city, "Interest at the legal rate upon the sum or sums to which the owners are justly entitled * * * shall be awarded * * * as part of the compensation to which the owners are entitled." This interest is compensation, but not compensation for the property itself, not for the capital. It is interest upon and compensation for use of money due. If petitioners had, on July 15, 1925, when their properties were taken by the city, been actually paid the then value, there would have been no interest paid them, but they were not paid anything until 1931. The judgment of June 9, 1931, does not mention interest, but merely itemizes the amounts awarded. The "final decree" prepared in accordance with the judgment adds interest to the awards already computed. We hold that such interest was taxable income to petitioners in 1931 at ordinary rates, and that the respondent did not err in so determining. As to those petitioners on an accrual basis, the interest could not be accrued earlier than 1931, since prior to 1931 the amounts were not known.

■ This point has to do with John W. Wainwright, Docket No. 77019, and the issue to be considered, as stated in assignment of error in his petition, is as follows:

The Commissioner erred in including in petitioner's income the sum of $16,117.34 fiduciary income received from the Estate of Margaret Wainwright representing petitioner's share of interest received by the Estate on account of condemnation award. If such interest is taxable, Commissioner erred in not holding it subject to tax at capital rates.

The facts relied on to support said assignment of error are stated in the petition as follows:

The Estate of Margaret Wainwright distributed to petitioner and petitioner reported in his return as income subject to normal and surtax rates the sum of $16,117.34 interest on the award received by the Estate of Margaret Wainwright so distributed to him.

The respondent objects to the consideration of the petitioner's contentions on this point, arguing that the question of whether John W. Wainwright received corpus of the trust estate was not raised by the pleadings of petitioner. Obviously, of course, the exact point now urged by petitioner was not set forth in his petition, yet in general he did plead that the sum of $16,117.34 was not income and furthermore, in the alternative, alleged that if income, it was not subject to tax at capital rates. We hold that this pleading is not insufficient to raise the question, particularly when it is considered in connection with a colloquy between counsel on that subject at the time of making the opening statements at trial, the result of which colloquy seems to have been an assumption by both counsel that the question was involved in the proceeding. We are not limited by the theory advocated by either party. *John I. Chipley*, 25 B. T. A. 1103. We proceed, therefore, to consider the question as to whether the amount was received as income from the trust estate or as legacy.

We have held above that the interest upon the amounts of the awards is not compensation for the property itself. Does this call for a conclusion that the interest on the awards is not "proceeds" of the sale of the property by operation of law, i. e., condemnation proceedings, within the meaning of the word "proceeds" as used in the will of Margaret Wainwright? We note that the same paragraph which makes provision for the payment of the proceeds of sale to John W. Wainwright also provides that the residue of her estate shall be held in trust by the executor, and the income paid to John W. Wainwright and his sister Margaret; and it is in connection with the management of the trust that the executor is authorized to sell and devote the proceeds to the son and daughter of the testatrix. The connotation of the word "proceeds" may be broad or narrow, depending upon the context in connection with which it is used, but

in general its meaning is by no means narrow. Considering the fifteenth clause of the will of Margaret Wainwright as a whole and in connection with the particular expression "proceeds" of sale, we conclude and hold that the amount in question was received by John W. Wainwright free from tax, as a devise of the proceeds of the land condemned.

■ As to the next question for decision, it is stated in brief of counsel for petitioners, in behalf of John W. Wainwright, that he was a stockholder in the Rockaway Beach National Bank, rendered his return on a cash basis, and in 1931 paid the amount assessed against him and was allowed a loss deduction in 1931 both for the cost of his stock and assessment paid, but that the loss allowance was limited to 12½ percent, being treated as though it were a loss on the sale of capital assets. It is insisted in brief that such loss limitation was erroneous.

The petition of John W. Wainwright, however, assigns no such alleged error—the pleadings raise no such issue. Petitioners' brief so agrees. The prayer of the petition is limited to the issues raised. Under such circumstances, we are of the opinion and hold that the alleged error, asserted only in brief and wholly omitted from petition and not supplied by amendment, should be disregarded. *Dixie Manufacturing Co.*, 1 B. T. A. 641, 645; *W. P. Weaver*, 2 B. T. A. 709, 711; *H. D. & J. K. Crosswell, Inc.*, 6 B. T. A. 1315, 1320; *D. N. & E. Walter & Co.*, 10 B. T. A. 620, 632.

■ The next point for decision has to do with Jamieson Associates, Inc., Docket No. 75717, and the issue raised by the assignment of error is as follows:

The Commissioner erred in not allowing as a deduction against income for 1931, the sum of $13,125 assessment levied against petitioner by the Superintendent of Banks of the State of New York on account of its liability as stockholder of an insolvent bank.

The record shows that petitioner purchased 175 shares of Rockaway Beach National Bank stock, par value $100 per share, for $21,000 in 1924, that the Rockaway Beach National Bank failed and a receiver was appointed, and that in October 1931 the United States Comptroller of the Currency made an assessment upon the shareholders of the Rockaway Beach National Bank of New York of the par value of their stock.

Jamieson Associates, Inc., claimed and was allowed as a deduction on its 1931 return the cost of its stock and the one-fourth of the assessment which was paid in 1931, and this petitioner insists that the remaining liability of the assessment, $13,125, paid in 1932, which was not allowed as a deduction in 1931, should have been then allowed.

This contention is based on the fact that Jamieson Associates, Inc., was on an accrual basis and that the full assessment liability, though not paid in 1931, nevertheless was a liability that accrued then and therefore the full amount was deductible from income. The claimed deduction, in our opinion and we so hold, is, in the light of the facts shown in the record and above referred to, authorized. The action of the respondent in disallowing same was error.

Our determination is in accord with the rulings on section 43 of the Revenue Acts of 1928, 1932, and 1934, as they appear in C. B. XIV-1, p. 17, and is sustained by the decision of the court in the case of *Burns Manufacturing Co.* v. *Commissioner*, 59 Fed. (2d) 504. Cf. *A. W. D. Weis*, 13 B. T. A. 1284.

█ This point is with respect to error assigned by Jamieson Associates, Inc., as follows:

The Commissioner erred in including in income a sum of $3,420.87 part of an improvement assessment paid by the taxpayer in prior years and refunded to petitioner in this year. [1931]

That the Commissioner erred as above set out appears to be conceded in his brief, it being there very briefly stated: "This point is probably sustained by the evidence received to sustain assignment 4 (f) in the petition, Docket No. 75717." However, be that as it may, we are of the opinion and hold that the Commissioner in this instance did err as above asserted by the petitioner, the issue being raised by the pleadings and there being sufficient competent evidence, not contradicted, sustaining petitioner's assignment of error. The improvement assessment having been capitalized when paid, was not income when refunded.

*Decision will be entered under Rule 50.*